**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND COALITION FOR CHILDREN AND FAMILIES,

COMMUNITY CARE ALLIANCE,

RHODE ISLAND COALITION AGAINST DOMESTIC VIOLENCE,

CALIFORNIA PARTNERSHIP TO END DOMESTIC VIOLENCE,

COLORADO COALITION AGAINST SEXUAL ASSAULT,

DISTRICT OF COLUMBIA COALITION AGAINST DOMESTIC VIOLENCE,

END DOMESTIC ABUSE WISCONSIN: THE WISCONSIN COALITION AGAINST DOMESTIC VIOLENCE,

GEORGIA COALITION AGAINST DOMESTIC VIOLENCE,

HAWAII STATE COALITION AGAINST DOMESTIC VIOLENCE,

IDAHO COALITION AGAINST SEXUAL AND DOMESTIC VIOLENCE,

VIOLENCE FREE IOWA,

JANE DOE INC., THE MASSACHUSETTS COALITION AGAINST SEXUAL ASSAULT AND DOMESTIC VIOLENCE,

KANSAS COALITION AGAINST SEXUAL & DOMESTIC VIOLENCE,

MAINE COALITION TO END DOMESTIC VIOLENCE,

MARYLAND NETWORK AGAINST DOMESTIC VIOLENCE,

Case No.

MONTANA COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE,

NEW JERSEY COALITION TO END DOMESTIC VIOLENCE,

NORTH CAROLINA COALITION AGAINST DOMESTIC VIOLENCE,

OREGON COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE,

PENNSYLVANIA COALITION AGAINST DOMESTIC VIOLENCE,

VALORUS,

VERMONT NETWORK AGAINST DOMESTIC AND SEXUAL VIOLENCE,

VIOLENCE FREE MINNESOTA,

VIRGINIA SEXUAL AND DOMESTIC VIOLENCE ACTION ALLIANCE,

WASHINGTON STATE COALITION AGAINST DOMESTIC VIOLENCE AND SEXUAL ASSAULT,

WISCONSIN COALITION AGAINST SEXUAL ASSAULT, and

HENNEPIN HEALTHCARE SYSTEM, INC.,

*Plaintiffs*,

v.

ROBERT F. KENNEDY JR., in his official capacity as Secretary of the United States Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

ALEX J. ADAMS, in his official capacity as Assistant Secretary of the Administration for Children and Families,

ADMINISTRATION FOR CHILDREN AND FAMILIES,

MARY LAZARE, in her official capacity as Principal Deputy Administrator for the Administration for Community Living,

ADMINISTRATION FOR COMMUNITY LIVING,

ERICA SCHWARTZ, in her official capacity as Director of the Centers for Disease Control and Prevention,

CENTERS FOR DISEASE CONTROL AND PREVENTION,

MEHMET OZ, in his official capacity as the Administrator for Centers for Medicare and Medicaid Services,

CENTERS FOR MEDICARE AND MEDICAID SERVICES,

THOMAS J. ENGELS, in his official capacity as Administrator of the Health Resources and Services Administration,

HEALTH RESOURCES AND SERVICES ADMINISTRATION,

BRIAN CHRISTINE, in his official capacity as Assistant Secretary for Health at the U.S. Department of Health and Human Services,

OFFICE OF THE ASSISTANT SECRETARY OF HEALTH,

CHRISTOPHER D. CARROLL, in his official capacity as Principal Deputy Assistant Secretary of the Substance Abuse and Mental Health Services Administration, and

SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION

*Defendants*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs, community-based nonprofit organizations, statewide domestic violence and sexual assault coalitions, and a county safety net hospital, bring this action to prevent Defendants from imposing ideological, extra-statutory conditions on grant funds.

2. Together, Plaintiffs represent hundreds of nonprofits across the country. They rely on grant funding for various programs from the Department of Health and Human Services (HHS) to provide critical services, support, and healthcare to their communities, including children, youth and families, survivors of domestic and sexual violence, and other vulnerable groups.

3. Yet again, HHS has attempted to force its ideological agenda on grantees across its programs. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy Jr.*, No. 1:25-cv-00342-MRD-PAS (D.R.I.); *see also State of New York v. HHS*, No. 1:26-cv-00022-MRD-RLA (D.R.I.).

4. An HHS-wide policy requires all divisions to implement two requirements in all funding applications or terms and conditions for discretionary awards: grant recipients must agree to "align" with agency priorities posted online, and funding applications must include certain policy principles (collectively, Challenged Conditions). Upon information and belief, all HHS divisions have implemented this mandatory policy and imposed the Challenged Conditions on discretionary grants, and at least some formula grants.

5. The Administration's policy priorities are all too familiar. They include erasure of gender identity and transgender people, elimination of diversity and inclusion practices that aim to address racial disparities, the exclusion of immigrants from services, and rejection of Housing First strategies that have been proven effective, among other priorities articulated in a series of executive orders.

6. Now, Plaintiffs face the lose-lose decision of accepting these unlawful conditions or forgoing necessary HHS grant funds. Plaintiffs cannot accept the Challenged Conditions without

fundamentally betraying their missions, clients, and risking legal liability. The Challenged Conditions, and the accompanying policy priorities, would require grantees to discontinue or fundamentally alter their programs and services that address the unique needs of LGBTQ+ individuals or specific racial, ethnic, or cultural communities, for example. Relatedly, the policy priorities that grantees are forced to align with are impossibly vague and expose Plaintiffs to arbitrary enforcement, including through False Claims Act actions or termination of their grants for alleged failure to comply with the Challenged Conditions.

7. The alternative of losing millions in funding that supports Plaintiffs and their members' life-saving work is also untenable. For Plaintiffs and their members that support survivors of domestic violence and sexual assault (State Coalitions), the loss of HHS funding would impair their ability to advocate for survivors' needs and safety concerns, to implement sexual and domestic violence prevention programs, to build statewide policies and best practices, and to provide direct services to survivors. Likewise, community-based nonprofit organizations, members of Plaintiff Rhode Island Coalition for Children and Families, would be forced to reduce access to critical social and health services for Rhode Island children, youth, and their families. The same goes for Hennepin Healthcare System Inc. and the vulnerable patients it serves in Minnesota.

8. Fortunately, Plaintiffs need not make this choice because the Challenged Conditions are unlawful in multiple respects. In imposing the Challenged Conditions, Defendants have violated the Administrative Procedure Act (APA) by acting without statutory authority, ignoring contrary statutes, and proceeding in an arbitrary and capricious manner. Moreover, the Constitution, including the Spending Clause and the separation of powers, prevent Defendants from encroaching on Congress's authority and unilaterally imposing conditions that are vague and untethered to the statutory purposes of the grant programs.

9. To prevent further harm to Plaintiffs and their members, the Challenged Conditions must be set aside and enjoined.

## PARTIES

10. **Plaintiff Rhode Island Coalition for Children and Families** (RICCF) is a statewide membership organization comprised of thirty-eight community-based nonprofit organizations providing child welfare, children's behavioral health, and a further array of child and family services and supports in every community in Rhode Island. Founded in 2015 and headquartered in Providence, Rhode Island. RICCF educates, advocates, and collaborates for transformational, equitable and just policies, practices, and resources that promote the safety, health, and success of Rhode Island's children from infancy to adulthood.

11. **Plaintiff Community Care Alliance** (CCA) is a non-profit organization founded in 1891 and headquartered in Woonsocket, Rhode Island. CCA is a certified Community Behavioral Health Center, Community Action Program, and Family Service organization. CCA's mission is to support individuals and families of all cultural backgrounds in their effort to meet economic, social and emotional challenges and enhance their well-being.

12. **Plaintiff Rhode Island Coalition Against Domestic Violence** (Rhode Island DV Coalition) is a domestic violence coalition membership organization founded in 1979 and located in Warwick, Rhode Island. The Rhode Island DV Coalition provides statewide leadership to prevent and address domestic violence, supports and enhances the work of its ten member agencies in Rhode Island to provide high-quality victim-focused services, creates justice for victims through legislative and systemic advocacy, and raises awareness on the occurrence and prevention of domestic violence in Rhode Island.

13. **Plaintiff California Partnership to End Domestic Violence** (California Partnership) is a domestic violence coalition membership organization founded in 1993 as the California Alliance

Against Domestic Violence and located in Sacramento, California. The California Partnership's membership includes domestic violence service providers, allied organizations, and individuals throughout the State. The organization supports service providers in their work with survivors and to implement prevention strategies, and advances systems change to prevent and end domestic violence. The California Partnership aims to align prevention and intervention strategies through policy, communications, and capacity-building efforts.

14. **Plaintiff Colorado Coalition Against Sexual Assault** (Colorado Coalition) is a sexual assault coalition membership organization founded in 1984 and headquartered in Denver, Colorado. The Colorado Coalition provides leadership, advocacy, and support to address and prevent sexual violence. It is made up of over ninety member sexual assault programs, dual domestic violence and sexual assault programs, college and university campuses, law enforcement agencies, offender treatment programs, public health agencies, medical professionals, prosecutors, sexual assault survivors, and victim advocates, as well as other organizations and concerned individuals throughout Colorado.

15. **Plaintiff District of Columbia Coalition Against Domestic Violence** (DC Coalition) is a domestic violence coalition membership organization founded in 1986 and headquartered in Washington, D.C. The DC Coalition provides training and technical assistance for its direct-service member programs, allied organizations, and government partners to understand how to lawfully implement best practices when serving survivors of domestic violence; leads local policy and advocacy efforts on behalf of and along with survivors of domestic violence; and works to build primary prevention efforts into programming available for young people in D.C.

16. **Plaintiff End Domestic Abuse Wisconsin: The Wisconsin Coalition Against Domestic Violence** (End Abuse Wisconsin), founded in 1978, is a statewide non-profit membership organization of domestic violence victims, survivor programs, and allied partners committed to

preventing and ending domestic violence. Headquartered in Madison, Wisconsin, End Abuse Wisconsin promotes practices and policies to prevent and eliminate domestic violence, including providing technical support and assistance to domestic violence programs across the State, training legal and other professionals on domestic violence dynamics, and engaging in public policy to ensure that survivors' needs are met.

17. **Plaintiff Georgia Coalition Against Domestic Violence** (Georgia Coalition) is a domestic violence coalition membership organization headquartered in Atlanta, Georgia. It is Georgia's federally recognized domestic violence coalition and represents more than fifty domestic violence organizations and programs across the State. The Georgia Coalition works with its members and allies to achieve social and systems change on behalf of survivors and their families.

18. **Plaintiff Hawaiʻi State Coalition Against Domestic Violence** (Hawaiʻi Coalition) is a domestic violence coalition membership organization. It is a statewide partnership of 22 domestic violence programs and shelters. The Hawaiʻi Coalition is the only statewide entity in Hawaiʻi that provides training, technical assistance, and capacity-building support to domestic violence agencies. Through education, advocacy, and public policy work, it promotes practices that keep victims safe, hold those who cause harm accountable, and improve systemic responses to survivors and their families.

19. **Plaintiff Idaho Coalition Against Sexual and Domestic Violence** (Idaho Coalition) is a dual domestic violence and sexual assault coalition membership organization founded in 1980 and headquartered in Boise, Idaho. The Idaho Coalition works to end gender-based violence from its systemic roots, including by providing member organizations with training and technical assistance, access to statewide and national training and development, and participation in state-level advocacy and systems reform.

20. **Plaintiff Violence Free Iowa** is a dual sexual and domestic violence coalition membership organization founded in 1985 and headquartered in Des Moines, Iowa. Violence Free Iowa supports a statewide network of twenty-three victim service provider agencies, connects survivors with the assistance they need, and advocates for policy and community transformation to make Iowa a safer place for everyone. It supports a survivor-centered approach to victim services and ensures access to services for all victims of gender-based violence, particularly ensuring access to underserved populations.

21. **Plaintiff Jane Doe Inc., the Massachusetts Coalition Against Sexual Assault and Domestic Violence** (Massachusetts Coalition) is a dual domestic violence and sexual assault coalition membership organization founded in 1998 and headquartered in Boston, Massachusetts. Massachusetts Coalition mobilizes collective power and resources to build a safer, healthier, freer Massachusetts beyond abuse and violence. Massachusetts Coalition provides training, policy and systems advocacy, technical assistance, and support for its sixty member programs, system partners, and the public.

22. **Plaintiff Kansas Coalition Against Sexual & Domestic Violence** (Kansas Coalition) has operated as a dual sexual assault and domestic violence coalition membership organization since 1990. Located in Topeka, Kansas, the Kansas Coalition comprises twenty-four member organizations. The Kansas Coalition is dedicated to preventing and ending sexual and domestic violence, dating violence, and stalking in Kansas. The Kansas Coalition supports survivors and the people who serve them by promoting safety, healing, justice, and lasting change.

23. **Plaintiff Maine Coalition to End Domestic Violence** (Maine Coalition) is a domestic violence coalition membership organization. The Maine Coalition works to end domestic abuse, dating abuse, stalking, elder abuse, and commercial sex trafficking. It provides training, technical assistance, and administrative support to its member organizations. The Maine Coalition also

supports state-level partners and advocates for state and federal policies that hold abusive people accountable and keep survivors safe.

24. **Plaintiff Maryland Network Against Domestic Violence** (Maryland Network) is a domestic violence coalition membership organization. The Maryland Network brings together domestic violence service providers, allied professionals, and concerned individuals to reduce intimate partner and family violence and its harmful effects. It trains and provides technical assistance to advocates and allied professionals, including law enforcement officers, health care providers, and social workers.

25. **Plaintiff Montana Coalition Against Domestic and Sexual Violence** (Montana Coalition) is a dual domestic violence and sexual assault coalition membership organization founded in 1986 and headquartered in Helena, Montana. The Montana Coalition provides training and technical assistance to service providers addressing domestic and sexual violence in the State and serves as a resource for member and allied organizations by providing training, technical assistance, conducting statewide planning and needs assessment, developing and enhancing service standards, and gathering and disseminating critical resources and information.

26. **Plaintiff New Jersey Coalition to End Domestic Violence** (NJ Coalition) is a domestic violence coalition membership organization. Formerly known as the New Jersey Coalition for Battered Women, the NJ Coalition has a membership of 36 domestic violence programs. These programs serve survivors, their children, and people who cause harm throughout the state. The NJ Coalition leads collaborative community and systemic responses to domestic violence through public awareness, training, advocacy, policy development, technical assistance, and supportive services, including housing and economic justice work and primary prevention initiatives.

27. **Plaintiff North Carolina Coalition Against Domestic Violence** (North Carolina Coalition) is a domestic violence coalition founded in 1981 and headquartered in Durham, North

Carolina. The North Carolina Coalition provides training and technical assistance to its membership and convenes and participates in meetings across the State with membership and allied professionals with the goal of bridging any gaps in domestic violence services and improving communication and collaboration between service providers.

28. **Plaintiff Oregon Coalition Against Domestic and Sexual Violence** (Oregon Coalition) is a dual domestic violence and sexual assault coalition membership organization composed of rural and urban members, founded in 1978 and headquartered in Portland, Oregon. The Oregon Coalition provides statewide leadership, technical assistance, and support to its member programs that serve survivors, the public, friends, family and all whose lives are affected by domestic and sexual violence.

29. **Plaintiff Pennsylvania Coalition Against Domestic Violence** (Pennsylvania Coalition) is a domestic violence coalition founded in 1976 and headquartered in Harrisburg, Pennsylvania. The Pennsylvania Coalition serves as both a membership organization and a funder for Pennsylvania's domestic violence service programs, making it the largest domestic violence coalition in the United States. It provides technical assistance, training, and advocacy, as well as development of service standards and monitoring programs for compliance with funding requirements.

30. **Plaintiff ValorUS** (VALOR) is a sexual assault coalition membership organization founded in 1980 and based in Sacramento, California. VALOR is committed to advancing equity and ending sexual violence, including by providing training and technical assistance to support California rape crisis centers and allied organizations, coordinating with partner organizations including law enforcement, prosecution, sex offender treatment, and violence prevention practitioners, and offering training and conference opportunities.

31. **Plaintiff Vermont Network Against Domestic and Sexual Violence** (Vermont Network) is a dual domestic violence and sexual assault coalition membership organization founded in 1986.

Its member organizations provide advocacy and support to victims of domestic and sexual violence and together serve every town in the state. The Vermont Network works to address the root causes of domestic and sexual violence in Vermont. It does this through training and leadership development, support for direct-service organizations, organizing and awareness campaigns, and public policy advocacy on behalf of victims and survivors.

32. **Plaintiff Violence Free Minnesota** is the Minnesota domestic violence coalition membership organization founded in 1978 and based in Saint Paul, Minnesota. Violence Free Minnesota is composed of over ninety member programs across the State that are aimed at ending relationship abuse. The coalition represents victims and survivors of relationship abuse; leads public policy advocacy and social change efforts; and offers support, education, and opportunities for connection for members.

33. **Plaintiff Virginia Sexual and Domestic Violence Action Alliance** (Virginia Action Alliance) is a dual domestic violence and sexual assault coalition membership organization founded in 1981 and headquartered in Richmond, Virginia. The Virginia Action Alliance serves as a leading voice on sexual and intimate partner violence and as a network of survivors, sexual and domestic violence agencies, and allies that works to strengthen community responses to and prevention of sexual and intimate partner violence in the State. It provides more than seventy member sexual and domestic violence agencies statewide with access to resources, training opportunities, technical assistance, and input on policies and practices that advance safety, justice, and healing for survivors.

34. **Plaintiff Washington State Coalition Against Domestic Violence and Sexual Assault** (Washington Coalition) is a domestic violence and sexual assault coalition membership organization founded in 1990 by survivors and their allies. It is a network of more than seventy member programs that serve survivors, their children, and their families in communities across the State. The Washington Coalition mobilizes its members and allies to end domestic and sexual

violence through advocacy and action for social change. Its work includes training victim advocates, supporting member programs, educating the public, and leading statewide initiatives such as Domestic Violence Housing First, an evidence-based approach proven to increase victim safety, decrease further victimization, improve housing stability, decrease PTSD symptoms, and improve children's pro-social behaviors.

35. **Plaintiff Wisconsin Coalition Against Sexual Assault** (Wisconsin SA Coalition) is a sexual assault coalition membership organization founded in 1985 and headquartered in Madison, Wisconsin. The Wisconsin SA Coalition works to create social change to end sexual violence by supporting and centering survivors, advocating for systemic and legislative change, and strengthening the capacity of sexual assault service providers across the State. The Wisconsin SA Coalition provides its 84 members with individualized training and technical assistance opportunities, access to support and resources, and invitations to coalition-hosted events.

36. **Plaintiff Hennepin Healthcare System, Inc.** (Hennepin Healthcare) is a subsidiary corporation of Hennepin County, Minnesota. Hennepin Healthcare is a Level 1 adult and pediatric trauma center and the busiest safety-net hospital in Minnesota, predominately serving a low-income population, and other vulnerable groups. Hennepin Healthcare relies on numerous grants from HHS to achieve its mission of ensuring access to outstanding care for everyone.

37. **Defendant Department of Health and Human Services** (HHS) is a cabinet department of the United States federal government, headquartered in Washington, D.C. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

38. **Defendant Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services. He is sued in his official capacity.

39. **Defendant the Administration for Children and Families** (ACF) is an operating division of HHS, headquartered in Washington, D.C. ACF is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

40. **Defendant Alex J. Adams** is the Assistant Secretary of ACF. He is sued in his official capacity.

41. **Defendant Administration for Community Living** (ACL) is an operating division of HHS, headquartered in Washington, D.C. ACL is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

42. **Defendant Mary Lazare** is the Principal Deputy Administrator of the Administration for Community Living. She is sued in her official capacity.

43. **Defendant the Centers for Disease Control and Prevention** (CDC) is an operating division of HHS, headquartered in Atlanta, Georgia. CDC is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

44. **Defendant Erica Schwartz** is the Director of the CDC. She is sued in her official capacity.

45. **Defendant the Centers for Medicare & Medicaid Services** (CMS) is an operating division of HHS, headquartered in Maryland. CMS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

46. **Defendant Mehmet Oz** is the Administrator for the Centers for Medicare & Medicaid Services. He is sued in his official capacity.

47. **Defendant the Health Resources & Services Administration** (HRSA) is an operating division of HHS, headquartered in Washington, D.C. HRSA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

48. **Defendant Thomas J. Engels** is the Administrator of the HRSA. He is sued in his official capacity.

49. **Defendant Office of the Assistant Secretary of Health** (OASH) is an operating division of HHS, headquartered in Washington, D.C. OASH is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

50. **Defendant Admiral Brian Christine** is the Assistant Secretary of Health. He is sued in his official capacity.

51. **Defendant the Substance Abuse and Mental Health Services Administration** (SAMHSA) is an operating division of HHS, headquartered in Rockville, Maryland. SAMHSA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

52. **Defendant Christopher D. Carroll** is the Principal Deputy Assistant Secretary of the SAMHSA and appears to be serving as interim Assistant Secretary for the SAMHSA.[1] He is sued in his official capacity.

## JURISDICTION AND VENUE

53. This Court has subject-matter jurisdiction over this action because this action arises under the Constitution and laws of the United States, including the APA. 28 U.S.C. § 1331.

54. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(c) because no real property is involved and at least one Plaintiff resides in this District.

[1] The SAMHSA website reflects that Dr. Carroll is managing and directing SAMHSA. *Office of the Assistance Secretary for Mental Health and Substance Use*, Substance Abuse & Mental Health Servs. Admin. (Dec. 15, 2025), https://perma.cc/3GN2-46GP. The President nominated Dr. Timothy Westlake to serve as Assistant Secretary for Mental Health and Substance Use on July 14, 2026; his nomination remains pending in the Senate (as of October 28*). PN1180-3 — Timothy Westlake — Department of Health and Human Services*, Congress.gov, https://perma.cc/GXU4-HBJD.

## FACTUAL ALLEGATIONS

### HHS Awards Billions of Dollars in Grants to Advance Health and Wellbeing

55. HHS aims to protect the health and wellbeing of communities across the country. As the largest grantmaking federal agency, it awards billions of dollars each year to advance its mission.[2] In fiscal year 2026, HHS awarded over $81 billion in discretionary awards alone.[3]

56. HHS works through its operating divisions. These operating divisions award grant funds to nonprofit organizations, states, and local governments to provide services, advance innovative research, and in some cases, for infrastructure and construction projects.

57. There are at least thirteen grantmaking divisions at HHS. They include the:

- Administration for Children and Families
- Administration on Community Living
- Agency for Healthcare Research and Quality
- Agency for Toxic Substances and Disease Registry
- Assistant Secretary for Preparedness and Response
- Centers for Disease Control and Prevention
- Centers for Medicare & Medicaid Services
- Food and Drug Administration
- Health Resources and Services Administration
- Indian Health Service
- National Institutes of Health
- Office of the Assistant Secretary for Health

---

[2] *HHS Grants*, U.S. Dep't of Health & Hum. Servs. (Mar. 2, 2023), https://perma.cc/GBC8-F68C.

[3] *All HHS Discretionary Awards by Activity Type for FY 2026*, Tracking Accountability in Gov't Grants Sys., https://perma.cc/FRH5-XR9A.

- Substance Abuse and Mental Health Services Administration.[4]

**Plaintiffs and Their Members Rely on HHS Grants**

58. Plaintiffs and their members have received grants from HHS, including discretionary grant awards, and expect to receive grant awards in the future. These grants are critical to advancing Plaintiffs' and their members' missions and serving their communities and patients.

59. Plaintiff RICCF and its 38 full member organizations, all community-based nonprofits, rely on HHS grant funding to support Rhode Island children, youth, and their families. RICCF's members, including CCA, receive funding from several HHS divisions for a diverse set of programs, such as programs that support child and family mental health and substance use services, foster care, family reunification and permanence, early childhood education, special educational services, juvenile justice diversion, healthcare, and economic supports, among others.

60. Many Plaintiffs are federally recognized state coalitions against domestic violence and/or sexual assault. *See* 42 U.S.C. § 10402(11) (defining State Domestic Violence Coalition); 34 U.S.C. § 12291(39) (defining State Sexual Assault Coalition). These State Coalitions rely on HHS grant funding to perform the crucial function of supporting direct services organizations on the frontlines of crisis response and providing essential foundations for prevention efforts. They do so through policy advocacy, development of best practices, provision of technical assistance, and training programs. Some of the training and certification programs the State Coalitions provide are required under state law, and members cannot serve survivors without completing them. Many State Coalitions also provide direct services themselves in their communities including violence prevention programs, crisis support, legal services, and housing programs. The State Coalitions receive a significant portion of their funding through federal block and formula grant programs,

---

[4] *Get Ready for Grants Management*, U.S. Dep't of Health & Hum. Servs. (Dec. 10, 2024), https://perma.cc/5FX7-EPR7; *Funding Opportunities*, OASH Office of Population Affairs, https://perma.cc/DU7L-4L79.

and these funds are an indispensable source of funding. In addition, many State Coalitions and their members apply for, and receive, discretionary funding from HHS divisions every year.

61. Plaintiff Hennepin Healthcare, a safety net hospital, likewise relies on HHS grant funding to provide quality healthcare and services to its patients. In addition, Hennepin Healthcare receives construction funding to improve its infrastructure and expand its ability to serve more patients, particularly those struggling with addiction.

***Administration for Children and Families*** **(ACF)**

62. Plaintiffs and their members receive federal grant funding from ACF, both direct and pass-through, and they expect to apply for and receive funding from ACF in future funding cycles.

63. ACF is a large source of funding for members of Plaintiff RICCF. In addition to several block grants, Several of RICCF's members hold grant awards from discretionary programs including the Head Start Grant Program.

64. Over many years, the State Coalitions and their members have received several grants from ACF authorized by the Family Violence Prevention Services Act (FVPSA). They also expect to apply for other FVPSA grants from ACF in future funding cycles.

65. Of the State Coalitions, those designated as State Domestic Violence Coalitions each receive funds under the State Coalitions Program. 42 U.S.C. § 10411. The statute sets out how much funding each coalition must receive. 42 U.S.C. § 10411(b)(1); *see also* 42 U.S.C. § 10403(a)(2)(D). These grant funds support the core work of the State Coalitions discussed above.

66. FVPSA also authorizes formula grants to states that are often passed through to the State Coalitions or their members. The Secretary must award formula grants to states to support programs and projects designed to prevent family, domestic, and dating violence; provide immediate shelter and supportive services to victims and their dependents, and to provide specialized services for children exposed to violence, and to victims who are members of racial and ethnic minority

populations. 42 U.S.C. § 10406(a). Some coalitions have already received their grant agreements for fiscal year 2027, and others expect new agreements from their state entities imminently.

67. In addition to receiving significant portions of their funding through non-discretionary formula and block grants, the State Coalitions receive funding through ACF's competitive discretionary grant programs. For example, some Plaintiffs or their members, including the DC Coalition, Maine Coalition, the Rhode Island DV Coalition, and the Vermont Network receive funding, either direct or as a sub-awardee, through the Specialized Services for Abused Parents and Their Children program (Specialized Services Program). Grantees under this program help non-abusing parents in their caregiver role and in meeting their children's social, emotional, and developmental needs.[5] ACF issued a Notice of Funding Opportunity (NOFO) for the Specialized Services Program in August 2026.[6] Those Plaintiffs that received awards have already begun work under the grant, and must accept the terms and conditions of the award when they draw down funds starting as early as November.

68. As another example, several State Coalitions or their members receive funding through the FVPSA Culturally Specific DV and SA Discretionary Grants program (Culturally Specific Program). This program builds the capacity of culturally specific organizations to provide trauma-informed, culturally relevant services to survivors of domestic violence and sexual assault.[7] ACF issued a NOFO for the Culturally Specific Program in August 2026.[8] Organizations that received

[5] 42 U.S.C. § 10412; *HHS-2026-ACF-OFVPS-EV-0052*, Grants.gov (Aug. 11, 2026), https://perma.cc/JT6J-TKW5. [Specialized Services NOFO]

[6]Specialized Services NOFO, *supra* note 5.

[7] *Family Violence Prevention and Services/Culturally Specific Domestic Violence and Sexual Violence Services*, Federal Program Inventory, https://perma.cc/N3Y3-NVY9.

[8] *HHS-2026-ACF-OFVPS-EV-0036*, Grants.gov (Aug. 11, 2026), https://perma.cc/A6CT-QCX6.

awards have already begun work under the grant, and must accept the terms and conditions when they draw down funds starting as early as November.

69. In addition to the several examples of FVPSA grant funds referenced above, Plaintiffs and their members have been awarded several other discretionary grants from ACF either directly or as passthrough entities.

70. For example, the Washington Coalition receives funding, as a subaward from the state, through the Safe Access for Victims' Economic Security demonstration program (SAVES Program).[9] The SAVES Program is a five-year demonstration project meant to allow domestic violence survivors who need child support but have been unable to access it due to the abuser's violence to safely access child support, parenting time, and paternity services. The Washington Coalition expects its grant agreement with the state to be renewed.

***Administration for Community Living***

71. Some Plaintiffs and their members have applied for and receive funding from ACL, including from the Administration on Aging, and plan to apply for funding in future funding cycles.

72. For example, one of Plaintiff RICCF's members received direct funding from ACL's Administration on Aging for several years. This funding was used to deliver and sustain Chronic Disease Self-Management Education (CDSME) programming, evidence-based interactive workshops designed to help older adults and adults with disabilities gain the practical skills, confidence, and knowledge needed to manage ongoing health conditions. This member anticipates applying for ACL grants in future funding cycles.

---

[9] 42 U.S.C. § 1315; *SAVES Project Summaries*, Office of Child Support Enforcement (Aug. 15, 2023), https://perma.cc/9ZXC-2LP6.

***Centers for Disease Control and Prevention (CDC)***

73. Plaintiffs and their members have either applied for or received grant awards for several grant programs administered by the CDC, including discretionary programs. They also expect to apply for other grants from the CDC in future funding cycles.

74. Several of Plaintiff RICCF's members receive direct grants from CDC's National Center for Injury and Prevention Control that are used for substance abuse prevention and sexual violence prevention work.

75. For example, Plaintiff CCA receives funding from the CDC Office for State, Tribal, Local and Territorial Support, passed through from the state, as part of its partnership in Rhode Island Overdose to Action, a multisector, interdisciplinary and comprehensive public health approach to respond to the overdose epidemic in Rhode Island.

76. Of the State Coalitions, several Plaintiffs and/or their members receive funding through the Rape Prevention and Education program (RPE Program). The RPE Program was created by the Violence Against Women Act (VAWA)[10] and focuses on primary prevention and building sexual violence prevention capacity. The RPE Program is a discretionary program based on HHS's designation on Grants.gov.[11]

77. The RPE Program awards grants directly to states and to state sexual assault coalitions. For example, Plaintiffs Colorado Coalition, Kansas Coalition, Oregon Coalition, VALOR, Vermont Coalition, Violence Free Iowa, and the Wisconsin SA Coalition receive the state coalition grant under the RPE Program. Other Plaintiffs or their members, including the DC Coalition, Massachusetts Coalition, and the Virginia Coalition, receive RPE Program funds passed through

---

[10] 34 U.S.C. § 12291 *et seq*.

[11] *CDC-RFA-CE-24-0068*, Grants.gov (Feb. 15, 2024), https://perma.cc/57WK-AN7N.

from their states. Some Coalitions or their members receive funding through both sources under the RPE Program.

78. As another example, State Coalitions or their members, including the California Partnership, the Rhode Island DV Coalition, the New Jersey Coalition, the North Carolina Coalition, and VALOR, receive funding through the Domestic Violence Prevention Enhancement and Leadership Through Alliances program (DELTA Program). The CDC provides funding to recipients to decrease risk factors and increase protective factors relating to intimate partner violence. Funded recipients work to address intimate partner violence, social determinants of health, and health equity.[12]

79. As another example, Plaintiff VALOR receives funding under the E-Learning Collaborative for Integrated Violence Prevention program. This peer-learning platform gives training and technical assistance to the CDC's Division of Violence Prevention's grantees, subrecipients, and practitioners. VALOR's Prevent Connect project holds a current award and serves RPE, DELTA AHEAD, and other CDC funded violence prevention recipients nationwide.[13]

***Centers for Medicare & Medicaid Services (CMS)***

80. Plaintiffs and their members have applied for and receive funding from CMS. They also expect to apply for other grants from CMS in future funding cycles.

81. As one example, a member of the Oregon Coalition receives passthrough funding from Oregon for the Rural Health Transformation (RHT) Program. The RHT Program aims to strengthen

---

[12] 42 U.S.C. § 10414; *Domestic Violence Prevention Enhancement and Leadership Through Alliances: Achieving Health Equity through Addressing Disparities*, Centers for Disease Control and Prevention (Feb. 8, 2024), https://perma.cc/2ZZ9-7FHS.

[13] *CDC-RFA-CE-25-0039*, Centers for Disease Control and Prevention (July 29, 2024), https://perma.cc/QB62-XRNA.

rural communities across America by improving healthcare access, quality, and outcomes.[14] Another member of the Oregon Coalition receives passthrough funding from CMS to improve Health Related Social Needs (HRSN). This funding allows states and organizations to address unmet social needs, including food insecurity, housing instability, and unemployment, to ultimately improve health outcomes and disparities.[15]

***Health Resources and Services Administration (HRSA)***

82. Plaintiffs and their members have either applied for or received grant awards for several grant programs, including discretionary programs, administered by HRSA. They also expect to apply for other grants from HRSA in future funding cycles.

83. Several of Plaintiff RICCF's members receive discretionary grants from HRSA, including grants administered by HRSA's Bureau of Primary Health Care, Healthcare Systems Bureau, and Maternal and Child Health Bureau.

84. Plaintiff Hennepin Healthcare receives several grants from HRSA and will apply for additional grants. In September 2026, Hennepin Healthcare was awarded a construction grant to expand its Addiction Medicine Clinic. HRSA awarded grants for construction projects related to healthcare based on a congressional appropriation (HRSA Construction Grant). Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. B, tit. II, 140 Stat. 173, 262 (2026) (appropriating $858 million to HRSA for "projects financing the construction and renovation (including equipment) of health care and other facilities" and certain one-time grants). The HRSA Construction Grant will allow Hennepin Healthcare to build a needed Center for Addiction Medicine that expands access, reduces overdose risk, and supports long-term recovery for

---

[14] *Rural Health Transformation (RRHT) Program*, Medicaid.gov, https://perma.cc/596Z-GBYT.

[15] *All-State Medicaid and CHIP Call*, Ctr. for Medicare and Medicaid Serv. (Dec. 6, 2022), https://perma.cc/D67K-T5SE.

individuals and families in the community. Hennepin Healthcare will effectively accept the grant terms and conditions of the grant when it begins drawing down the funds.

85. Plaintiff Hennepin Healthcare also receives funding through the Ryan White HIV/AIDS Program Part F Dental Reimbursement Program (Ryan White Dental Program). Hennepin Healthcare relies on this grant program to provide guaranteed dental care for patients living with HIV/AIDS. Many of these patients are low-income or no-income, and uninsured at the time of their visit. There are few healthcare organizations in Hennepin County that are willing to take on their care. Without the Ryan White Dental Program, many patients would have no access whatsoever to any dental care. Hennepin Healthcare received an award in September and expects to draw down these funds before the end of the year.

86. Plaintiff CCA also receives funding through the Ryan White HIV/AIDS Program, passed through from the State of Rhode Island. This funding is used to provide core medical services and supports to help Rhode Islanders impacted by HIV/AIDS. CCA expects to continue applying for and receiving this HRSA funding in the future.

***Substance Abuse and Mental Health Services Administration (SAMHSA)***

87. Plaintiffs and their members have either applied for or received grant awards for several grant programs, including discretionary programs, administered by SAMHSA. They also expect to apply for other discretionary SAMHSA grants in future funding cycles.

88. Many of Plaintiff RICCF's members receive direct grants from SAMHSA's Center for Mental Health Services, Center for Substance Abuse Prevention, and the Office of the Assistant Secretary for Mental Health and Substance Abuse.

89. As an example of SAMHSA's funding programs implicated by the challenged policies here, Plaintiff CCA has applied for and received a competitive grant from SAMHSA for the past 30 years, which they rely on to provide life-saving care to individuals and households in northern

Rhode Island. CCA receives a direct Certified Community Behavioral Health Clinic (CCBC) Infrastructure Grant from SAMHSA, as well as SAMHSA funding to operate the Youth and Family Tree. Additionally, CCA receives SAMHSA funding, passed through from the state, which is used to provide residential and respite services to individuals living with substance use disorder. CCA expects to continue reapplying for and receiving SAMHSA grants and subgrants each new grant cycle.

***Office of the Assistant Secretary of Health (OASH)***

90. Several members of Plaintiff RICCF receive funding from OASH, including grants administered by OASH's Office of Minority Health and Office of Population Affairs. This funding is used for family planning and health equity zones. They plan to apply for funding from programs administered by OASH again in future funding cycles.

91. As another example, Plaintiff Wisconsin SA Coalition receives funding through the Teen Pregnancy Prevention (TPP) Program, administered by OASH's Office of Population Affairs. The TPP Program awards federal funding to organizations that support "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation" or that are being tested to determine whether they meet that objective. Consolidated Appropriations Act, 2010, Pub L. No. 111-117, 123 Stat. 3034, 3253 (2009). Funding for this program is competitive and discretionary.[16]

**The Administration Leverages Federal Funding to Force its Ideological Agenda**

92. In August 2025, the President issued Executive Order 14332, Improving Oversight of Federal Grantmaking.[17] 90 Fed. Reg. 38929 (Aug. 12, 2025) (Grants EO). He vowed to end the

[16] Funded under Division B, Title II of the Consolidated Appropriations Act, 2026 (Pub. L. No. 119-75); *Funding Opportunities*, *supra* note 4.

[17] *Improving Oversight of Federal Grantmaking, Exec. Order 14332,* The White House (Aug. 7, 2025), https://perma.cc/UH4J-KX6Q.

"offensive waste of tax dollars" in federal grantmaking including grants awarded to recipients who hold "far-left" and "anti-American ideologies." The Grants EO also targeted organizations that serve undocumented immigrants.

93. To exert more political control over federal grantmaking, the Grants EO directed each agency head to designate a "senior appointee" (a political appointee) to develop and oversee new procedures for grantmaking to ensure consistency with "agency priorities and the national interest." Grants EO § 3.

94. Senior appointees were instructed to apply certain principles to discretionary awards including that "discretionary awards must, where applicable, demonstrably advance the President's policy priorities." Grants EO § 4(b)(i).

95. In addition, the Grants EO mandated that "discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate: (A) racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; (B) denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic; (C) illegal immigration; or (D) any other initiatives that compromise public safety or promote anti-American values." Grants EO § 4(ii).

96. The President's policy priorities are memorialized in a series of executive orders attacking transgender and nonbinary people, Diversity, Equity, and Inclusion (DEI), immigrants, unhoused individuals and the strategies proven effective like Housing First and harm reduction.

***Attacks on Transgender and Nonbinary People***

97. On January 20, 2025, the President issued Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. 90 Fed. Reg. 8615 (Jan. 30, 2025) (Gender EO).

98. The Gender EO announces "the policy of the United States to recognize two sexes, male and female." *Id.* § 2. It defines "Sex" narrowly to refer to "either male or female," and expressly rejects "the concept of 'gender identity.'" *Id.* § 2(a).

99. The Order defines "Gender Ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa." *Id.* § 2(f). It rejects the "idea that there is a vast spectrum of genders that are disconnected from one's sex" and that "it is possible for a person to be born in the wrong sexed body." *Id.*

100. The Gender EO attempts to use federal funding to advance the Administration's ideological vision. The Order directs federal agency heads to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id.* § 3(e). The Gender EO states that "[f]ederal funds shall not be used to promote gender ideology" and requires each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g).

***Attacks on Diversity, Equity, and Inclusion***

101. In January 2025, the President issued two executive orders targeting diversity, equity, and inclusion. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 29, 2025) (Anti-DEI EO), endeavored to eliminate anything labelled DEI from executive branch agencies. The second order, Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 31, 2025) (Private DEI EO), sought to impose a similar mandate primarily for the private sector.

102. The Anti-DEI EO seeks to terminate all "illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." Anti-DEI EO § 2(a). Among other directives,

agency heads must terminate "equity-related" grants or contracts, along with all DEI, DEIA, and environmental justice offices and positions, and all equity action plans and equity actions, initiatives, or programs. *Id.* § 2(b)(i).

103. The Private DEI EO admonishes private institutions for using "dangerous, demeaning, and immoral race- and sex- based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or . . . (DEIA)," and refers broadly to "illegal DEI and DEIA policies." Private DEI EO § 1. To deter DEI in the private sector, the order directs agencies to work with the Attorney General to identify potential targets of investigations and prosecutions. *Id.* § 4.

104. The two orders do not define DEI or DEIA, nor do they explain what would make a DEI or DEIA program illegal in the Administration's view.

105. On July 29, 2025, the Attorney General issued a memorandum, "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination" (DOJ Memo).[18] The DOJ Memo "clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ('DEI') programs." *Id.* at 1. It purports to offer "'Best Practices' as non-binding suggestions" to help entities that receive federal funds "comply with federal antidiscrimination laws and avoid legal pitfalls." *Id.*

106. The DOJ Memo offers a "non-exhaustive list of unlawful practices that could result in revocation of grant funding." *Id.* at 4. One category, "unlawful proxies," captures the use of "ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics." *Id.* at 5. Some examples include "cultural competence requirements," "diversity statements" or "overcoming obstacles" narratives, and recruitment

[18] Memorandum for All Federal Agencies from The Office of the Attorney General (July 29, 2025), https://perma.cc/V9UC-NE24.

strategies "targeting specific geographic areas, institutions, or organizations chosen primarily because of their racial or ethnic composition rather than other legitimate factors." *Id.*

107. None of these practices, so-called "unlawful proxies," are considered unlawful under current jurisprudence.

***Attacks on Immigrants***

108. On February 19, 2025, President Trump issued Executive Order 14218, Ending Taxpayer Subsidization of Open Borders, 90 Fed. Reg. 10581 (Feb. 25, 2025) (Open Borders EO). As part of the Administration's effort to ensure that "no taxpayer-funded benefits go to unqualified aliens," the order directed federal agencies and departments to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order[.]" *Id.* §§ 2, 2(i)

109. President Trump also issued Executive Order 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443 (Jan. 20, 2025), which directed the Attorney General and the Secretary of Homeland Security to "[i]mmediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws." *Id.* § 19(a)

***Attacks on Housing First and Harm Reduction***

110. On July 24, 2025, President Trump issued Executive Order 14321, Ending Crime and Disorder on America's Streets. 90 Fed. Reg. 35817 (Jul. 29, 2025) (Criminalization EO). In the name of public safety, the order seeks to put unhoused people in "long-term institutional settings" and to increase the use of civil commitment. *Id.* § 1. Without support, the order claims that the

"overwhelming majority" of unhoused people "are addicted to drugs, have a mental health condition, or both." *Id.*

111. The Order takes aim at what it considers ineffective methods of addressing homelessness. It directs SAMHSA not to fund "programs that fail to achieve adequate outcomes, including so-called 'harm reduction' or 'safe consumption' efforts that only facilitate illegal drug use and its attendant harm." Criminalization EO § 4(i).

112. The Order—again without support—further directs HHS to "end[] support for 'housing first' policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency." Criminalization EO § 5.

113. The President's policy priorities on these issues have been incorporated by HHS under Secretary Kennedy's direction.[19]

**HHS Adds Ideological Conditions to Grants**

114. On April 3, 2026, HHS issued the revised HHS NOFO Content and Clearance Guidance (Grants Policy) (attached as Exhibit 1). The Office of Grants, housed under the Office of the Assistant Secretary for Financial Resources, sent the Grants Policy to all HHS divisions. The Office of Grants does not award or administer grants directly, but instead provides direction on grant policy, oversight and evaluation, and other functions.[20]

115. The Grants Policy prescribes the content that all HHS grantmaking divisions must include in NOFOs and Notices of Award (NoAs).

116. Attachment 3 to the Grants Policy, titled "Required Language for Discretionary NOFOs and NoAs," states that it applies to *all* discretionary NOFOs and NoAs. This attachment sets out

[19] *HHS Priorities*, U.S. Dep't of Health & Hum. Servs. (Sep. 1, 2026), https://perma.cc/QFM7-VPS8.

[20] *Office of Grants*, U.S. Dep't of Health & Hum. Servs. (June 2, 2026), https://perma.cc/DW9Z-8W7F .

the mandatory terms and conditions and principles that all HHS divisions must include in discretionary awards. Attachment 3 to the Grants Policy sets out two primary directives that impact grantees' obligations.

117. The Alignment Condition: The Grants Policy provides that "agencies must also include a term and condition in each discretionary NoA (which can be incorporated by reference) through each respective agency's Terms and Conditions or through the program NOFO requiring alignment with agency priorities." Ex. 1. For divisions that have not developed their own term, the Grants Policy provides language that may be used: "The recipient of this award must implement any funds awarded under this NOFO to advance program goals or agency priorities in alignment with the agency priorities at [insert hyperlink to agency priorities], when authorized by the program statute." *Id*.

118. The Alignment Condition thus requires that all HHS divisions must include a term and condition "requiring alignment with agency priorities," either through the division's terms and conditions or through the program's NOFO. *Id.*

119. The Policy Principles: The Grants Policy directs that "senior appointees will review discretionary NOFOs and NoAs and apply the following principles, including in any scoring rubrics used to assess grant proposals." *Id.* Among them: discretionary awards "must, where applicable, demonstrably advance the President's policy priorities," and "shall not be used to fund, promote, encourage, subsidize, or facilitate" racial preferences, "denial by the recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," "illegal immigration," or "any other initiatives that compromise public safety or promote anti-American values." *Id.* Divisions using any principle in application review "must also describe them in the text of the NOFO alongside the review criteria." *Id.*

120. The Grants Policy incorporates the principles related to race, gender identity, immigrants, and "anti-American values" from the Grants EO verbatim.

121. The Grants Policy does not define "agency priorities," "the President's policy priorities," or "anti-American values." Instead, it directs divisions to hyperlink to priorities posted on agency websites, which the agencies can revise at any time without notice.

122. In relevant part, the Grants Policy imposes an HHS-wide policy that all discretionary awards must "demonstrably advance the President's policy priorities," and awards cannot be used to "fund, promote, encourage, subsidize or facilitate" certain "racial preferences . . . including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; denial by the recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic; illegal immigration; or any other initiatives that compromise public safety or promote anti-American values." Ex. 1 at 11-12.

123. The Grants Policy does not identify any statute that authorizes the Alignment Condition or the Policy Principles. The Grants Policy qualifies its requirements with phrases such as "to the extent permitted by law and applicable court orders" and "when authorized by the program statute" but HHS's divisions have not treated these phrases as limiting: they have adopted the Alignment Condition and Policy Principles (collectively, Challenged Conditions) across their standard terms and conditions and in individual NOFOs, including in some formula grants, without program-by-program statutory analysis.

**HHS Divisions Implement the Grants Policy and Adopt the Challenged Conditions**

124. HHS divisions have implemented the Grants Policy and adopted the Challenged Conditions by including them in their division-wide standard terms and conditions, in NOFOs, and other grant materials.

***Administration for Children and Families (ACF)***

125. On April 10, 2026, ACF revised its Standard Terms and Conditions (ACF Terms). The ACF Terms apply to all federal financial assistance awards or modifications made on or after April 10, 2026.

126. The ACF Terms include the Alignment Condition for discretionary awards: "the recipient must implement any funds awarded under this award to advance program goals or ACF priorities in alignment with ACF priorities at ACF Vision, Mission, Values, Priorities, & Guiding Principles, when authorized by the program statute."[21]

127. ACF thus implemented the Grants Policy's template nearly verbatim. *Compare* Ex. 1 at 12 ("The recipient of this award must implement any funds awarded under this NOFO to advance program goals or agency priorities in alignment with the agency priorities at [insert hyperlink to agency priorities], when authorized by the program statute."), *with* ACF Standard Terms ("the recipient must implement any funds awarded under this award to advance program goals or ACF priorities in alignment with ACF priorities at ACF Vision, Mission, Values, Priorities, & Guiding Principles, when authorized by the program statute").

128. In addition, in NOFOs, ACF requires grant applicants to attest to or certify that they are aligned with ACF's and the Administration's priorities. ACF's policy priorities are included on its website and include that ACF "will not fund programs that promote divisive Diversity, Equity, and Inclusion (DEI) ideologies," and "will not support programs that advance gender ideology, especially the teaching of gender ideology to children."[22]

129. One attestation, in the NOFO for the Specialized Services Program, states:

---

[21] *Standard Terms and Conditions, Federal Financial Assistance Programs*, Admin. For Children and Families (Apr. 10, 2026), https://perma.cc/H3KQ-DSM6.

[22] *Priorities*, Admin. for Children and Families (Sept. 18, 2026), https://perma.cc/8EA5-97CW.

> "I hereby attest and certify that: ____________________ (Applicant Name) affirms its commitment to supporting and advancing ACF's published Vision, Mission, Values, Priorities, and Guiding Principles of the Administration for Children and Families (ACF), consistent with applicable federal statutes, regulations, and Administration priorities."[23]

130. In addition to implementing the Alignment Condition, ACF has expressly restricted grantees from supporting DEI and "gender ideology" in the NOFOs for the Culturally Specific Program and Specialized Services Program:

> To the extent permitted by law, including any relevant court orders, you may not use funds from this NOFO for any diversity, equity, inclusion, and accessibility (DEI and DEIA) activities. This includes: DEI- or DEIA-related research; Activities that discriminate or show preference based on race, color, religion, sex, national origin, or other protected traits; Any efforts that promote a 'discriminatory equity ideology.' To the extent permitted by law, including any relevant court orders, ACF will also not allow funds awarded under this NOFO to support any services or activities that inculcate or promote gender ideology.[24]

ACF has also incorporated the Challenged Conditions in terms and conditions for non-discretionary programs. The Supplemental Terms and Conditions for FVPSA coalition grants and state formula grants incorporate the NOFOs for those programs.[25] Those NOFOs include a term requiring alignment with ACF policy priorities consistent with the Alignment Condition.[26]

---

[23] Specialized Services NOFO, *supra* note 5, at 36.

[24] *See, e.g.*, Specialized Services NOFO, *supra* note 5, at 18-19; see also *Family Violence Prevention and Services Culturally Specific Domestic Violence and Sexual Assault Discretionary Grants*, Admin. for Children and Families 13, https://perma.cc/LR5S-TJA6; *National Resource Centers*, Admin. for Children and Families 19, https://perma.cc/6AGD-ZSV8.

[25] *FY 2026 OFVPSA Supplemental Terms and Conditions, Family Violence Prevention and Services /Domestic Violence Shelter and Supportive Services (States/Territories And Tribes)*, Admin. For Children and Families, https://perma.cc/A362-SM2N; FY 2026 OFVPSA Supplemental Terms and Conditions, State Domestic Violence Coalitions (States and Territories), Admin. For Children and Families, https://perma.cc/Q69H-HKBL.

[26] *OFVPSA Standing Notice of Funding Opportunity for Family Violence Prevention and Services/Domestic Violence Shelter and Supportive Services/Awards to States,* U.S. Dep't of Health & Hum. Servs., https://perma.cc/PYM4-8VH7; OFVPSA *Standing Announcement for Family Violence Prevention and Services/ Grants to State and Territory Domestic Violence Coalitions*, U.S. Dep't of Health & Hum. Servs., https://perma.cc/Q2RB-6JXM.

***Centers for Disease Control and Prevention (CDC)***

131. The CDC revised its General Terms and Conditions for Non-Research Grants and Cooperative Agreements (CDC Terms) in August 2026. The CDC Terms apply to all non-research grants and cooperative agreements awarded or modified on or after August 13, 2026. The CDC Terms are not limited to discretionary awards.

132. Consistent with the Alignment Condition, "recipients must ensure that all activities funded under this award are implemented in a manner consistent with CDC's mission and strategic priorities as authorized by law."[27] In addition, grant recipients must comply with terms and conditions in the NOFO, NOA, applicable executive orders, among other HHS grant policies and regulations.[28]

133. The CDC's priorities, published on its website, include that the CDC does not support "gender ideology," DEI, or "so-called 'safe consumption sites,' or the use or distribution of illegal drugs and associated paraphernalia," and that "federal funds should not be used to encourage or support illegal immigration."[29]

134. For example, Plaintiffs Colorado Coalition, Kansas Coalition, Oregon Coalition, VALOR, Vermont Coalition, Violence Free Iowa, and Wisconsin SA Coalition must submit annual progress reports for CDC's RPE Coalition grant. The CDC uses language nearly identical to the Alignment Condition in its annual progress report requirements for grants that were awarded in prior funding cycles. For example, Plaintiffs must ensure that their progress reports comply with the Gender EO and the Anti-DEI EO.

[27] *General Terms and Conditions for Non-Research Grants and Cooperative Agreements*, U.S. Dep't of Health & Hum. Servs. (Aug. 13, 2026), https://perma.cc/Q7XS-DQ7V.

[28] *Id.*

[29] *CDC Priority Statement*, Centers for Disease Control and Prevention (Sep. 17, 2026), https://perma.cc/HQJ4-XH3H.

***Health Resources and Services Administration (HRSA)***

135. The FY 2026 HRSA General Terms and Conditions (HRSA Terms) likewise require alignment of funded activities with the agency's strategic priorities and the Administration's objectives.[30] Specifically, "as a condition of this award, [grantees] must ensure that all activities funded under this award are implemented in a manner consistent with HRSA's mission and strategic priorities as authorized by law."[31] The HRSA Terms apply to all discretionary awards with funds and award modifications made on or after March 11, 2026.[32]

136. Among other priorities listed on HRSA's website, "it is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex."[33]

137. HRSA has incorporated the Alignment Condition in NOFOs. The Ryan White Dental Grant NOFO includes the Alignment Condition as a post-award condition: "Recipients must use funds awarded under this NOFO to implement program goals or agency priorities in accordance with the HRSA vision, mission, core values, and strategic priorities, where authorized by law."[34]

138. The Policy Principles are incorporated as a disclaimer in the "Before You Begin" section of the Ryan White Dental Grant NOFO:

> All activities proposed in your application and budget narrative must align with applicable law, including but not limited to statutes, executive orders, federal regulations and applicable judicial holdings. Accordingly, discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate: racial preferences or other forms of racial discrimination by the recipient, including activities where race or intentional proxies for race will be used

---

[30] *FY 2026 HRSA General Terms and Conditions*, Health Resources & Servs. Admin. (Mar. 11, 2026) 5, https://perma.cc/FEB3-XDKA.

[31] *Id.*

[32] *Id.* at 1.

[33] *Advancing HRSA's Mission Through Focused, Accountable Action*, Health Resources & Servs. Admin. (May 2026), https://perma.cc/5PQW-43PV [HRSA Priorities].

[34] *Ryan White HIV/AIDS Program Part F Dental Reimbursement Program* (Ryan White NOFO), Health Resources & Servs. Admin. 32, https://perma.cc/V8WD-SSFN.

> as a selection criterion for employment or program participation; denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic; illegal immigration; or any other initiatives that compromise public safety. If an application does not align, the application will not receive funding to the extent permitted by law and applicable court orders.[35]

***Office of the Assistant Secretary of Health***

139. OASH has included the Challenged Conditions in its NOFOs.

140. In June 2026, OASH, through its Office of Population Affairs, issued a NOFO for the TPP Program.[36] Consistent with the Grants Policy, the NOFO includes the Alignment Condition:

> The recipients of this award must implement any funds awarded under this NOFO to effectuate program goals and agency priorities in accordance with the Priorities of the Office of the Assistant Secretary for Health (available at https://health.gov/priorities), and when authorized by law according to the TPP statute, regulations, legislative mandates, and additional program guidance.

141. The Policy Principles are also incorporated in the NOFO under the heading "Discretionary Award Terms." Further, the NOFO states that "all activities proposed in your application and budget narrative must align with applicable law, including but not limited to statutes, executive orders, federal regulations, and applicable judicial holdings."

***Substance Abuse and Mental Health Services Administration (SAMHSA)***

142. SAMHSA revised its Standard Terms and Conditions (SAMHSA Terms) in June 2026.[37] The SAMHSA Terms apply to discretionary grants and cooperative agreements awarded by SAMHSA on or after June 3, 2026.

143. The SAMHSA Terms adopt the Challenged Conditions.

---

[35] *Id.* at 3

[36] *Office of Population Affairs, Notice of Funding Opportunity,* U.S. Dep't of Health & Hum. Servs., https://perma.cc/MUY4-AB4C.

[37] *The Substance Abuse and Mental Health Services Administration Fiscal Year (FY) 2026 Standard Terms and Conditions,* Substance Abuse and mental Health Servs. Admin. (revised June 3, 2026), https://perma.cc/W7YS-HV8F.

144. Under the new terms, recipients must comply with all applicable executive orders and funded activities must be implemented consistently with SAMHSA's mission and strategic priorities.[38] Those priorities include ending DEI, "gender ideology," and the subsidization of illegal immigration, and deprioritizing "so-called 'harm reduction' or 'safe consumption' efforts that only facilitate illegal drug use and its attendant harm."[39]

145. SAMHSA also incorporated the Policy Principles verbatim. In addition, the SAMHSA Terms specifically requires compliance with the Gender Ideology EO: "Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964,42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement."[40]

146. These conditions have been incorporated in NOFOs such as for the Behavioral Health and Community Safety Partnerships program.[41]

**The Grants Policy and the Divisions' Adoption of the Challenged Conditions are Final Agency Actions**

147. The Grants Policy is a final agency action. It is not a draft or interim document but rather sets out "Required Language" that all HHS divisions "must" include in "all discretionary NOFOs

[38] *Id.* at 1-2.

[39] *SAMHSA Strategic Priorities*, Substance Abuse and Mental Health Servs. Admin. (Sep. 10, 2025), https://perma.cc/N8D7-Q8HT.

[40] *Supra* note 39 at 8.

[41] SAMHSA, Behavioral Health and Community Safety Partnerships (BH-CSP) NOFO, at 20-21, *Office of the Assistance Secretary for Mental Health and Substance Use*, Substance Abuse & Mental Health Servs. Admin. (June 11, 2026), https://perma.cc/R8UP-9CEN.

and NoAs." It marks the consummation of HHS's decision-making on the content of applications and awards for discretionary programs.

148. The Grants Policy determines rights and obligations and produces legal consequences. It binds every HHS grantmaking division to include the Challenged Conditions in every discretionary NOFO and NoA. It directs senior appointees to implement the Policy Principles in reviewing awards.

149. Upon information and belief, all HHS grantmaking divisions have implemented the Grants Policy by adopting the Challenged Conditions.

150. No Plaintiff can obtain a discretionary HHS award without accepting the Challenged Conditions. Plaintiffs have been forced to accept the Challenged Conditions for some non-discretionary formula grants as well.

151. Each division's adoption of the Challenged Conditions in its standard terms and conditions, or in individual NOFOs, as identified in the examples provided in paragraphs 125-147, is also a discrete final agency action. Grantees must accept the Challenged Conditions to receive federal funding awards from the HHS divisions.

**The HHS Grants Policy and the Divisions' Adoption of the Challenged Conditions Harm Plaintiffs**

152. Plaintiffs face a lose-lose decision due to Defendants' imposition of the Challenged Conditions. They can forgo federal funding—essentially cutting off their ability to fulfill their missions and provide life-saving services—or accept conditions that are fundamentally incompatible with their core values, statutory duties, and constitutional requirements, and are impermissibly vague and virtually impossible to comply with. In addition, failure to comply with the conditions exposes recipients to scrutiny and potential legal liability under the False Claims Act.

153. Federal funding is an essential component of Plaintiffs' funding streams and thus their ability to operate and carry out their missions. Plaintiffs collectively apply for federal funding every year, and receive federal funding through multiple formula grants, block grants, and discretionary grants from many different HHS programs administered by the many divisions within HHS.

154. The HHS-wide policy impacts Plaintiffs and will continue to impact Plaintiffs each year that they apply for necessary funding from any division of HHS. Plaintiffs will continue to face the impossible choice presented by the Challenged Conditions each year they apply for or otherwise renew the terms of their federal awards.

155. Plaintiffs believe in equality and dignity and aim to serve anyone in need of their services regardless of gender identity, race, or ethnicity. But the Challenged Conditions, including the adoption of these conditions by HHS divisions, make that virtually impossible.

156. For one, the Administration's and HHS's policy priorities reject any recognition of transgender and nonbinary people and promotion of what they deem "gender ideology." That will prevent Plaintiffs and their members from recognizing that any identities exist beyond the gender binary, including by using people's preferred pronouns. To satisfy the Challenged Conditions, Plaintiffs would have to outright reject or alienate the communities and patients they serve, who are already more vulnerable than other groups.

157. The Policy Principles suggest that "intentional proxies for race" are discriminatory and unlawful. While that term is undefined, the Administration has suggested that "unlawful proxies" including taking cultural competence into account or targeting underserved racial or ethnic communities in program participation. Plaintiffs and their members fear that their recognition of race, inequality, and different needs in their programs will put their grant funds at risk.

158. The State Coalitions would also be acting contrary to their legal duties. Under VAWA and FVPSA, the State Coalitions *must* serve "underserved populations" which include those who face

barriers in accessing victim services because of "geographic location, religion, sexual orientation, gender identity, underserved racial and ethnic populations, and populations underserved because of special needs (such as language barriers, disabilities, alienage status, or age)." 34 U.S.C. § 12291(a)(46); 42 U.S.C. § 10402(14). Their work to provide targeted programs to support underserved racial and ethnic populations could be seen as violating the Challenged Conditions because they are allegedly discriminating based on race. Likewise, despite the Challenged Conditions ban on recognizing gender identity beyond the sex binary, FVPSA grantees are required to serve people in accordance with their gender identity. *See, e.g.*, 45 C.F.R. § 1370.5(a)(1), (a)(4), (c)(1). These contradictions put Plaintiffs in an impossible position—they must either violate the Challenged Conditions or violate federal law.

159. Plaintiffs would also be at odds with state law if they comply with the Challenged Conditions. Several states prohibit discrimination based on certain traits, including sex, gender identity or expression, and sexual orientation in public accommodations. *See, e.g.*, R.I. Gen. Laws § 11-24-2 (2002); Minn. Stat. § 363A.11 (2025). This once again puts Plaintiffs in an impossible position—they must either violate the Challenged Conditions or violate state law.

160. Furthermore, even though the Challenged Conditions purport to apply only to discretionary funding (though at least some HHS divisions appear to apply them in other contexts as well), Plaintiffs' work cannot separate out funding that comes from discretionary federal grants as compared to non-discretionary federal funding sources. Even if only a fraction of a Plaintiffs' budget comes from discretionary sources, the Challenged Conditions seriously curtail Plaintiffs' ability to carry out their work. For example, a Plaintiff (or a Plaintiff's member) that provides crisis services such as operating a domestic violence shelter, cannot use only funds to which the Challenged Conditions do not apply when providing services to a transgender domestic abuse survivor. In many cases, beds are purchased, staff salaries paid, and property leased using funding

that comes from both discretionary grants and formula or block grants. Thus, the harm caused by the Challenged Conditions is not lessened in instances where funding that attaches the Challenged Conditions impacts a smaller portion of a Plaintiff's budget.

161. Even if Plaintiffs accept the Challenged Conditions in good faith, they still fear termination of their grants because the conditions and the related policy priorities are vague, internally inconsistent, and easily susceptible to arbitrary enforcement.

162. For example, Plaintiffs must "align" with HRSA's policy of prioritizing "evidence-based programs."[42] But in the next sentence, HRSA rejects "harm reduction" or "safe consumption" efforts "that only facilitate illegal drug use."[43] But harm reduction efforts, like syringe exchange, are not done "only to facilitate illegal drug use." In addition, harm reduction, when implemented correctly, is widely accepted as an evidence-based strategy. That contradiction leaves Plaintiffs like Hennepin Healthcare in a quandary.

163. The same is true for Housing First programs and initiatives. Housing First is an evidence-based strategy, proven effective at reducing homelessness by an HHS-funded study. Yet HHS's priority, rejecting Housing First, would discourage or prohibit Plaintiffs like the Washington Coalition from implementing Domestic Violence Housing First strategies that increase survivor safety, decrease further victimization by abusers, and improve housing stability.

164. Not to mention, the Administration's and HHS's policy priorities—or interpretation of policy priorities—can shift at any moment, which creates a tremendous amount of uncertainty, risk, and compliance costs for Plaintiffs.

165. Plaintiffs and the communities they serve will face devastating consequences if they lose critical grant funding due to the Challenged Conditions. The HHS grant programs Plaintiffs rely on

---

[42] HRSA Priorities, *supra* note 33.

[43] *Id.*

support survivors of domestic abuse and sexual assault and their children, people suffering from substance use disorders, and HIV patients.

166. Without the HHS grant funds, the State Coalitions and their members will be forced to reduce the services they provide. As the leading voices on issues of domestic violence and sexual assault, the State Coalitions foster communication, educate the public and raise awareness, advance best and promising practices to increase safety and abuser accountability, as well as prevent violence, share resources, and promote collaboration among members. This statewide capacity and infrastructure would be greatly diminished to the detriment of victims of domestic and sexual violence, and their children. The loss of federal funding would mean the State Coalitions would not be able to provide the same level of training and technical assistance to members, who rely on that assistance in providing trauma-informed, ethically, and legally-compliant services to survivors. Many Plaintiffs and member organizations would have to cut staff, drastically reducing their abilities to provide survivor-centered support and services to members seeking their support.

167. Declining the HHS grant funding, due to these conditions, would have a significant detrimental impact on Plaintiff CCA and members of Plaintiff RICCF. The loss of HHS-funded services would leave Rhode Island children and families with reduced access to community-based social services and behavioral health treatment, resulting in family disruptions, increased hospitalizations, and the need to place children, youth, and adults in more restrictive settings for longer periods of time. Families would also lose access to needed economic and family supports. For the agencies themselves, staff would lose their jobs, and nonprofit organizations may be faced to close their doors altogether.

168. If Hennepin Healthcare loses its HRSA Construction Grant, because the services it provides in its Addiction Treatment Clinic conflict with HHS priorities, it will not be able to expand its clinic as planned. The expansion would allow the clinic to serve roughly 1,000 more patients

per year, provide primary care and mental health care on site, and extend its hours of operation. In addition to meeting the growing need for addiction services in the county, the expansion will reduce hospitalizations, emergency room visits, and premature death. This life-saving work will be impeded if Hennepin Healthcare loses its HRSA Construction Grant due to the Challenged Conditions.

169. Likewise, Hennepin Healthcare relies on the Ryan White Dental Grant to pay for dental care for uninsured patients living with HIV/AIDS. Without the grant, Hennepin Healthcare will be forced to cut coverage, leaving an already-vulnerable patient population with no viable care options.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act: In Excess of Statutory Authority

170. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

171. Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

172. An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704.

173. The Grants Policy requires all HHS divisions to include the Challenged Conditions in NOFOs and/or standard terms and conditions. Upon information and belief, all HHS grantmaking divisions have implemented that policy, as required.

174. Defendants HHS's and Kennedy's decision to impose the Challenged Conditions through the Grants Policy is final agency action reviewable under 5 U.S.C. § 704 because it marks the consummation of the agency's decision-making process and determines grantees' rights or obligations and produces legal consequences. The Grants Policy is mandatory and binds every HHS grantmaking division.

175. For similar reasons, the HHS divisions' actions to impose the Challenged Conditions in NOFOs and standard terms and conditions are also final agency actions reviewable under 5 U.S.C § 704. The HHS divisions' actions are final and determine rights and obligations and produce legal consequences because grant recipients must accept the Challenged Conditions to receive federal funds from HHS divisions.

176. No statute authorizes Defendants to impose the Challenged Conditions. Defendants therefore acted in excess of their statutory authority. The Grants Policy's own terms acknowledge that the policy may only be applied "when authorized by the program statute", yet HHS is requiring the Challenged Conditions to be applied agency-wide, without any consideration of whether each program's authorizing statutes provide any such authority.

177. The Grants Policy imposing the Challenged Conditions must be held unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." The HHS divisions' adoption of the Challenged Conditions, in standard terms and conditions and individual NOFOs, must also be held unlawful and set aside to restore the status quo.

## COUNT II
## Administrative Procedure Act: Contrary to Law

178. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

179. Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

180. The Challenged Conditions, and Defendants' cross-referenced policy priorities, conflict with statutes authorizing multiple grant programs because the conditions prevent Plaintiffs from recognizing gender identity and serving transgender and nonbinary people. Although the Challenged Conditions purport to only apply "to the extent permitted by law and applicable court orders" and "when authorized by the program statute," HHS's divisions have not treated these

phrases as limiting: they have adopted the Alignment Condition and Policy Principles (collectively, Challenged Conditions) without program-by-program statutory analysis.

181. Likewise, the Challenged Conditions bar diversity and inclusion efforts broadly and "racial preferences" including use of race or "intentional proxies for race" when used to determine program participation.

182. For example, grantees that receive funds authorized by FVPSA must serve "underserved populations" and victims who are "members of racial and ethnic minority populations." 42 U.S.C. § 10411(d)(3). "Underserved populations" include those "who face barriers in accessing and using victim services" due to sex, sexual orientation, or racial identity, among other identities. 42 U.S.C. § 10402(14); 34 U.S.C. § 12291(a)(46).

183. As another example, Plaintiffs use certain grants authorized by VAWA to "increase awareness in underserved communities" of sexual assault, sexual violence, and related topics. 42 U.S.C. § 280b–1b(a). Plaintiffs' efforts to serve "underserved communities" requires providing targeted programming by race, sex, or sexual orientation.

184. Plaintiffs cannot fulfill their statutory duties without running afoul of the Challenged Conditions and Defendants' related policy priorities.

185. The Grants Policy imposing the Challenged Conditions must be held unlawful and set aside as contrary to law. The HHS divisions' adoption of the Challenged Conditions, in standard terms and conditions and individual NOFOs, must also be held unlawful and set aside to restore the status quo.

**COUNT III**
**Administrative Procedure Act: Arbitrary and Capricious**

186. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

187. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

188. Defendants' impositions of the Challenged Conditions are arbitrary and capricious for several reasons, including the following:

189. Defendants provided no reasonable explanation for their decision to impose the Challenged Conditions across all HHS divisions.

190. Defendants failed to consider multiple important aspects of the problem, including the serious reliance interests of applicants, grantees, and the communities served by HHS grants.

191. The vagueness of the Challenged Conditions further renders them arbitrary and capricious as applicants and grantees have no adequate notice of what they must do to comply.

192. Defendants failed to consider the practical implications of complying with the Challenged Conditions requiring alignment with "agency priorities" listed on agency websites that can be revised at any time and without notice.

193. The Challenged Conditions are also arbitrary and capricious because they conflict with several laws, regulations, and constitutional provisions.

194. The Grants Policy imposing the Challenged Conditions must be held unlawful and set aside as arbitrary and capricious. The HHS divisions' adoption of the Challenged Conditions, in standard terms and conditions and individual NOFOs, must also be held unlawful and set aside to restore the status quo.

**COUNT IV**
**Administrative Procedure Act: Contrary to Constitutional Right**

195. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

196. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

197. As described in Counts V-VII, the Challenged Conditions violate the First Amendment and the constitutional separation of powers and associated constitutional provisions.

198. The Grants Policy imposing the Challenged Conditions must be held unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The HHS divisions' adoption of the Challenged Conditions, in standard terms and conditions and individual NOFOs, must also be held unlawful and set aside to restore the status quo.

**COUNT V**[44]
**First Amendment: Free Speech Clause**

199. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

200. The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

201. The government, in providing funding, cannot "aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 543 (1983)). The government can also violate the First Amendment by imposing funding conditions that are "not relevant to the objectives of the program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

202. In addition, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

203. The Challenged Conditions necessarily force grantees to align their organizational mission and beliefs with HHS's and the Administration's policy views particularly on matters related to race and gender identity as a condition of funding.

204. The Challenged Conditions are not relevant to the grant programs administered by HHS and are intended to suppress views the Administration disagrees with.

[44] This claim is asserted by all Plaintiffs except Hennepin Healthcare.

205. For these reasons, the Challenged Conditions violate the First Amendment, and Defendants must be enjoined from enforcing or implementing them, including through the HHS grantmaking divisions.

**COUNT VI**
**Separation of Powers**

206. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

207. The Constitution gives Congress the authority to make laws, U.S. Const. art. I, § 1.

208. The Spending Clause of the Constitution states: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1.

209. The Spending Clause vests Congress with the power of the purse including the authority to attach conditions to federal funds.

210. The President is limited to faithfully executing duly enacted legislation, U.S. Const. art. II, § 3, and has no authority to modify or amend such legislation.

211. Congress enacts statutes to establish grant programs for specific purposes. Those statutes do not give the Executive Branch any authority to impose the extra-statutory Challenged Conditions. And Congress has not delegated or authorized the Executive Branch to impose such conditions.

212. Defendants' imposition of the Challenged Conditions violates separation of powers principles because it infringes on Congress's legislative authority and power of the purse and contradicts the President's duty to faithfully execute Congress's laws.

213. To prevent the violation of the separation of powers, Defendants must be enjoined from enforcing or implementing the Challenged Conditions, including through the HHS grantmaking divisions.

**COUNT VII**
**Spending Clause**

214. Plaintiffs incorporate and reallege all paragraphs above as if fully set forth here.

215. The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

216. As described above, Defendants violate the separation of powers because the Challenged Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, Defendants violate the Spending Clause as well.

217. The Spending Clause also requires funding recipients to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

218. Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

219. Finally, federal funds "may not be used to induce the [recipients] to engage in activities that would themselves be unconstitutional." *Id.* at 210.

220. Even if Congress had delegated authority to HHS and the HHS divisions to condition grant funding on acceptance of the Challenged Conditions, the Challenged Conditions would violate the Spending Clause by:

a. imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

b. imposing conditions that are not germane to the stated purpose of the HHS program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

c. imposing conditions that violate recipients' First Amendment rights.

221. Similarly, even if Congress had delegated the authority to HHS to impose the Challenged Conditions, they would violate the Spending Clause by imposing ambiguous grant conditions and imposing conditions not germane to the purposes of the statutes that authorize the HHS programs. For example, the requirement that funding recipients comply with administration and agency priorities is unconstitutionally vague as those priorities may be subject to continuous change and revision. The Challenged Conditions accordingly violate the Spending Clause's clear notice principle that requires conditions on federal funding to be unambiguous and prospective so that potential recipients have an opportunity to knowingly and voluntarily accept or reject the terms of the funding arrangement.

222. To prevent the violation of the Spending Clause, Defendants must be enjoined from enforcing or implementing the Challenged Conditions, including through the HHS grantmaking divisions.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Hold unlawful, vacate, and set aside the Challenged Conditions in the Grants Policy under 5 U.S.C. § 706;

b. Hold unlawful, vacate, and set aside the Challenged Conditions adopted in the HHS divisions' terms and conditions and NOFOs under 5 U.S.C. § 706;

c. Declare that the Challenged Conditions are unlawful under the APA and the Constitution;

d. Stay the Challenged Conditions, including in the HHS divisions' terms and conditions, NOFOs, and awarded grants, pursuant to 5 U.S.C. § 705, and issue all other necessary and appropriate process to preserve the status quo for the pendency of this litigation;

e. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing, implementing, or giving effect to the Challenged Conditions or any substantively similar condition in any NOFOs or awards, or from otherwise imposing the Challenged Conditions or any substantially similar condition on any HHS funding recipient;

f. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

g. Grant such other relief as the Court deems necessary, just, and proper.

October 29, 2026

Respectfully submitted,

*/s/ Amy R. Romero*
Amy R. Romero (RI Bar No. 8262)
Juan Bedoya (MA Bar No. 706954)*
Lawyers' Committee for Rhode Island
56 Pine Street, 2nd Floor
Providence, RI 02903
(401) 453-1500
Amy@lawyerscommitteeri.org
Juan@lawyerscommitteeri.org

Aleshadye Getachew (D.C. Bar No. 1007161)*
Anna L. Deffebach (D.C. Bar No. 241346)*
Joel McElvain (D.C. Bar No. 448431)*+
Robin F. Thurston (D.C. Bar No. 1531399)*+
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
agetachew@democracyforward.org

adeffebach@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

Lynette Labinger (RI Bar No. 1645)
Cooperating counsel, ACLU Foundation of RI
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com

* *Pro hac vice forthcoming*

*Counsel for Plaintiffs*